**TAYLOR ROSE ROGERS  -  September 24, 2024**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

TAYLOR ROSE ROGERS,              )
                                 )
        Plaintiff,               )
                                 )   Civil Action No.
                                 )   3:24-CV-00038
vs.                              )
                                 )
CITY OF SANTA FE, TEXAS,         )
et al,                           )
                                 )
        Defendants.              )
                                 )

_____

ORAL VIDEOTAPED DEPOSITION OF

TAYLOR ROSE ROGERS

SEPTEMBER 24, 2024

_____


        ORAL VIDEOTAPED DEPOSITION OF TAYLOR ROSE
ROGERS, produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the
above-styled and numbered cause on September 24, 2024,
from 10:00 a.m. to 1:25 p.m., Nilda Codina, Notary in
and for the State of Texas, recorded by machine
shorthand, from Lewis Brisbois Bisgaard & Smith, LLP,
24 Greenway Plaza, Suite 1400, Houston, Texas, 77046,
pursuant to the Federal Rules of Civil Procedure, and
the provisions stated on the record or attached hereto.

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1
                    A-P-P-E-A-R-A-N-C-E-S
 2
      FOR THE PLAINTIFF:
 3
           Mr. Randall L. Kallinen, Esq.
 4         KALLINEN LAW, PLLC
           511 Broadway St.
 5         Houston, TX 77012
           Phone (713)320-3785
 6         attorneykallinen@aol.com

 7
      FOR THE DEFENDANT:
 8
           Mr. Norman R. Giles, Esq.
 9         LEWIS BRISBOIS BISGAARD & SMITH, LLP
           24 Greenway Plaza
10         Suite 1400
           Houston, TX 77046
11         Phone (832)460-4637
           Fax (713)759-6830
12         norman.giles@lewisbrisbois.com

13
           Mr. Cory Rush, Esq.
14         SPALDING NICHOLS LAMP LANGLOIS
           3700 Buffalo Speedway
15         Suite 560
           Houston, TX 77098
16         Phone (713)993-7060
           Fax(888)726-8374
17         crush@snll-law.com

18
           Ms. Elizabeth M. Rice, Esq.
19         SPALDING NICHOLS LAMP LANGLOIS
           3700 Buffalo Speedway
20         Suite 560
           Houston, TX 77098
21         Phone (713)993-7062
           Fax(888)726-8374
22         lrice@snll-law.com

23
      ALSO PRESENT:  Brent Moore, Videographer
24

25
                         I-N-D-E-X
```

SUMMIT COURT REPORTING
713-581-7785

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1                                          PAGE

2  Appearances.......................................2

3  TAYLOR ROSE ROGERS

4  Direct Examination by Mr. Giles.....................4

5  Cross-Examination by Mr. Rush.....................118

6  Proceedings concluded............................122

7  Reporter's certificate...........................123

8                  E-X-H-I-B-I-T-S

9                                          PAGE

10 Exhibit No. 1 Witness' drawing......................10

11 Exhibit No. 2 Deferred Adjudication document........81

12 Exhibit No. 3 Minivasive records...................86

13

14

15

16

17

18

19

20

21

22

23

24

25

TAYLOR ROSE ROGERS  -  September 24, 2024

1                         P-R-O-C-E-E-D-I-N-G-S

2                         THE VIDEOGRAPHER:  Today's date is

3   September 24, 2024.  The time is 10:08 a.m. And we are

4   now on the record.

5                         THE REPORTER:  Would all parties

6   please state their appearances and who they represent

7   for the record?

8                         MR. KALLINEN:  Randall Kallinen for

9   the plaintiff.

10                        MR. GILES:  Norman Giles.  I represent

11  Officer Carranza.

12                        MR. RUSH:  Cory Rush and Liz Rice for

13  Ruben Espinoza.

14                        TAYLOR ROSE ROGERS,

15  Having been first duly sworn, was examined and

16  testified as follows:

17                        THE REPORTER:  Counsel, ready to

18  proceed.

19                        MR. GILES:  Yes.  Thank you.

20                        DIRECT EXAMINATION

21  BY MR. GILES:

22       Q.  Good morning.

23       A.  Good morning.

24       Q.  Sorry you had to drive over to this part of

25  town.  I know it's challenging if you're living in

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  Santa Fe, right?

2      A.   Yeah.

3      Q.   All right.  Well, thank you for coming.  I

4  appreciate that.  This is my chance to ask you

5  questions.  My name is Norman Giles.  We've met before.

6  I don't know if you remember that.  I got old and gray

7  since I talked to you last, but it's okay.

8                      (Laughter.)

9          But, anyway, tell us your name so I can get

10 that on the record before I start talking about

11 something else.

12     A.   Taylor Rogers.

13     Q.   (BY MR. GILES:) All right, Ms. Rogers.  So

14 I'm going to talk -- tell you a few things that will

15 make the deposition go a little more smoothly before we

16 get started.

17         Then I'm going to ask you questions about the

18 lawsuit, all right?

19     A.   All right.

20     Q.   So this lady's trying to take down a

21 transcript of everything that I say and you say and

22 anybody else says.  So it's important for us to help

23 her do that.

24         And the best way we can help her is first not

25 talk at the same time, all right?

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1   that.  I might ask you one or more, two questions

2   before that.

3          But then we can take a break if you want to

4   go to the restroom, you want to walk around or just

5   anything, all right?

6          A.   Okay.

7          Q.   So -- so what I want to do first is -- I'm

8   going to basically ask you about what happened on the

9   day of the arrest that you're -- you filed the lawsuit

10  about, all right?

11         A.   Okay.

12         Q.   And so what I want to do is -- because you

13  moved around the school in different places I'm going

14  to ask you just to take a second, and just do a rough

15  sketch for me.

16         Because it will help us talk about the

17  relative positions in the parking lot of where the

18  school was, where you were.  And I'm going to let you

19  help me explain as you're talking so that I'll

20  understand.

21         Because I've never been to the school.  I

22  don't know how it's set up.  I don't know where the

23  roads are.  And so if you'll just take a second, and

24  just make a rough sketch that will help us talk.

25         And what I want you to do is put where the

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  school is, where the streets were, that you were on

2  that day, and the parking lots where you were, so that

3  we can kind of talk about it piece by piece, all right?

4      A.   Okay.

5             MR. GILES:  And I'll mark this as 1.

6  Here you go.

7             (Exhibit No. 1 marked.)

8             MR. KALLINEN:  Objection, best

9  evidence is the -- the videos.  But go ahead.

10     A.   I actually drew -- I actually did that a

11  little bit.

12     Q.   (BY MR. GILES:) That's good.

13     A.   The school is like way closer to the street.

14     Q.   You need another piece of paper or -- or

15  you're good?

16     A.   No, I think -- I think we're good.  Okay.  I

17  think this is pretty good.

18     Q.   Okay.  Okay.  So just kind of tell me what

19  things are there in your -- in your sketch.

20     A.   So this is the school -- yeah, this is the

21  school.  This is the front parking lot.  This is the

22  bus round, and this is the back parking lot.

23     Q.   Okay.  Could -- do you mind just writing that

24  on each of those so we'll know --

25     A.   Uh-huh.

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1    Q.   -- what they are later when somebody reads
2  them?
3    A.   Oh, it looks like I forgot one.  This is my
4  drawing.  I think that's the right street.
5    Q.   Okay.  Forgive me for standing because we
6  have to be able to see it, too, okay?
7    A.   Yes.
8    Q.   All right.  That's fine.  All right.  So you
9  basically marked the parking lots and the school
10 building.  And that's -- that's very good.  Thank you.
11 Okay.  So let me -- let me ask you this before we --
12 before we start with the diagram.
13          Am I correct that this was an elementary
14 school?
15    A.   Yes.
16    Q.   What's the name of it?
17    A.   RJ Wollam.
18    Q.   Okay.  And what grade was your son in on
19 the -- at the time of the arrest?
20    A.   I believe 3rd.
21    Q.   Okay.  And am I correct that the -- the
22 incident we're talking about occurred in August of
23 2021.
24          Does that sound right?
25    A.   Yes.

TAYLOR ROSE ROGERS  -  September 24, 2024

1      A.   Yes, sir.

2      Q.   Okay.  Great.  And so we're going to get now

3  back to the -- back to the sketch here, and get you to

4  help me with.

5           And on this particular day had there been

6  some change in the way the -- the traffic flow was

7  going at the school, the way that the police were

8  handling it, or is it still the same way that it had

9  been before when you had been there?

10     A.   COVID was going on.  So I think they were

11  changing the rules.

12     Q.   How so?

13     A.   They -- there's an entry point this way and

14  this way for traffic coming this way.  They would both

15  meet right here.

16           (Witness indicating.)

17     Q.   Okay.

18     A.   They would take turns going up this line to

19  drop their kids off in the front.

20     Q.   Okay.  So -- so we're going to have to later

21  be able to look at that diagram and make sense of it.

22  So I'm going to ask -- ask you to help me as we go

23  along here, right.

24           And so we're going to start with your first

25  this way -- so -- so just go ahead and show me what's

TAYLOR ROSE ROGERS  -  September 24, 2024

1  lot of cars.  So I was just going to go back to the

2  back.

3      Q.   Okay.  So as I understand what you're saying

4  is you typically went to the parking lot that you

5  marked 1. You thought on this day, because you were

6  running late, it might be faster if you went to parking

7  lot 2; is that correct?

8      A.   Correct.

9      Q.   And so then you went to parking lot 2. And

10  you found out that there were a lot of people there,

11  and you decided to go back to parking lot 1; is that

12  correct?

13      A.   Well, also Espinoza advised me that you

14  cannot pull in right here and take turns anymore and I

15  was like "Okay, all right."

16      Q.   Okay.  So let me go back to the -- to the --

17  the one that's -- 1, the one you typically went to.

18          What street is that nearest?

19      A.   Walker.

20      Q.   Okay.  And the one you've marked 2, what

21  street is that nearest?

22      A.   Avenue S.

23      Q.   And -- and when you approached the school,

24  did you approach it from the walk -- from the side

25  where -- where the -- where you've marked number 1?  Is

TAYLOR ROSE ROGERS  -  September 24, 2024

1  that where you approached from?

2       A.   No.

3       Q.   Where -- where did you approach?  Which

4  direction, from?

5       A.   Coming this way.

6            (Witness indicating.)

7       A.   This would be north.  Okay.  So I was coming

8  from south.

9       Q.   All right.  And what's the name of that

10  street?

11       A.   Avenue South.

12       Q.   I'm sorry?

13       A.   Avenue South.

14       Q.   Avenue South?

15       A.   Or S.

16       Q.   S?

17       A.   Avenue S.

18       Q.   Okay.  Great.  So you were -- you were -- you

19  traveled in north on Avenue S. And then how -- which

20  way did you -- was -- was there a street there?

21       A.   I entered into the second part of the -- of

22  this parking lot.  There was Espinoza.

23       Q.   Okay.  And so on this day you didn't actually

24  ever drive past the place where you usually drop him

25  off; is that correct, where the 1 is?

TAYLOR ROSE ROGERS  -  September 24, 2024

1      A.   I mean, I never use this parking lot -- or

2   not the parking lot.  I mean I never drop him off at

3   the front.

4      Q.   Right.

5      A.   But I was familiar with the parking lot.

6      Q.   Thank you.  And I'm going to try to ask a

7   different question before I get to that.

8           On this -- typically when you came would

9   you -- would you also come north on S as you approached

10  the school?

11     A.   Yes.

12     Q.   Okay.  And then typically would you then make

13  a left turn to go to the different parking lot?

14     A.   Correct.

15     Q.   And what would that street be, that you had

16  to make the left turn on?

17     A.   Walker.

18     Q.   Okay.  But this time, when you're coming

19  north, instead of turning left on Walker you continued

20  to go straight; is that --

21     A.   Correct.

22     Q.   Okay.  And so you went -- you went straight

23  until -- what happened?

24     A.   Espinoza was right there.  And he stopped me.

25  So I opened my door because my window does not roll

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  down.

2       Q.   Okay.

3       A.   And he advised me that we could no longer

4  use -- we could no longer take turns.  And I said,

5  "Okay," I would -- "Can I just turn around through this

6  parking lot and go back?"  And he said, "No."  Because

7  I was trying to avoid backing out into traffic because

8  it was -- it was -- so he said, "No."

9            So I had to do that, anyways.  I backed out

10  and went and pulled into a house driveway to turn then

11  around and go back to the back parking lot.

12       Q.   Okay.  Was -- was -- you're -- you're driving

13  in north on Avenue S?

14       A.   Uh-huh.

15       Q.   And -- and are -- are you going into a

16  parking lot before you see Officer Espinoza or are you

17  still on S?

18       A.   I'm driving into the parking lot.  And he

19  stopped me.  So I stopped, opened the door.  And he

20  spoke with me.  And then he touched my -- he was taking

21  forever, talking.  And he wasn't understanding what I

22  wanted to do, I guess.  So he kept talking.

23       Q.   Okay.  I'm trying to understand, though.

24  When you're having this conversation with him are you

25  still on Avenue S or you had -- or you don't --

TAYLOR ROSE ROGERS  -  September 24, 2024

1    A.   I was in the parking lot.

2    Q.   Okay.  So you came north on S. You had gone

3 into the parking lot.

4         And then as you're in the parking lot that's

5 when you encountered Officer Espinoza?

6    A.   Correct.

7    Q.   Okay.  And then am I correct that what --

8 that what you wanted to do at that point, when you --

9 when you encountered Officer Espinoza, is you planned

10 to make a -- a left-hand turn --

11   A.   Correct.  Through the parking lot.

12   Q.   Through the parking lot.  Great.

13   A.   To come out here.

14   Q.   And Officer Espinoza said you can't make a

15 left-hand turn.  And then you ask him if you could --

16 how did you want to turn around that's different from

17 the way you ultimately turned around?

18   A.   What -- what it was is he kept telling me I

19 couldn't turn right.  But he wasn't understanding --

20 he -- at first he wasn't understanding that I didn't

21 want to go up there because it was packed.

22         So I had then finally said -- I got upset

23 because he was in my personal space and touched me, or

24 whatever.  And so at that point I was aggravated.  And

25 he then understood what I was trying to do, but he was

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  ~~like "No, you can't use the parking lot to turn~~

2  ~~around."~~

3       ~~So I was like "Okay."  So I did what he said.~~

4  ~~And I backed up into the traffic, and went all the way,~~

5  ~~and turned around in someone's driveway, and went back~~

6  ~~towards the back.~~

7

8

9

10     Q.   Okay.  All right.  And so what was -- what's

11  your best recollection of what Officer Espinoza told

12  you at that time?

13     A.   He was just telling me that there was a new

14  rule.  And he was saying how everybody was upset about

15  it.  And he was going on and on.  And I was annoyed

16  that he wouldn't just allow me to do what I was trying

17  to do.

18     Q.   Okay.  And you're in a hurry because

19  you're -- you already know you're running late?

20     A.   I wanted my son to eat breakfast on time.

21     Q.   Okay.

22     A.   And we were there in time for him to get

23  breakfast.

24     Q.   All right.  In any case, after you -- after

25  you left Officer Espinoza then am I correct that you

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1   then drove south on Avenue S, or south on S?

2      A.   West, I think, on -- on Walker Street.

3      Q.   Okay.

4      A.   But when I left the parking lot, yeah, that

5   would be south.

6      Q.   So first you went south on S?

7      A.   Uh-huh.

8      Q.   And then you went west on --

9      A.   Right.   Sorry.

10     Q.   Okay.   On Walker.   And so you're going down

11  Walker?

12     A.   Uh-huh.

13     Q.   And then what happened next?

14     A.   So I saw that this parking lot was full of

15  kids, and this parking lot was empty, which was the

16  student/teacher parking lot.   And it didn't have any

17  signs or anything.   So I just went in -- or I saw her,

18  this lady, jumping up and down.   And I was like "Oh, my

19  God."

20     Q.   The lady you're talking about was a police

21  officer; is that right?

22     A.   At the time I believed that she was like a

23  crazy security guard because I had spoken with her

24  before.

25     Q.   Uh-huh.

**SUMMIT COURT REPORTING**
**713-581-7785**

TAYLOR ROSE ROGERS  -  September 24, 2024

1    ~~A.    And she went nuts on me, so --~~

2    Q.    Okay.  Was -- was she wearing a uniform?

3    A.    I don't -- at that time I did not see a

4    uniform.

5    Q.    Okay.  So the lady that you -- the lady that

6    you spoke with regardless of -- tell me -- tell me what

7    the problem was when -- that you had with her before.

8    A.    I never -- oh, the problem that I had with

9    her?  It was freezing cold, when Santa Fe had a freeze.

10   It was like really cold.  And me and my son were early

11   dropping him off.

12          So the -- there was no one in the back.  And

13   that's where I usually go.  And we walk up.  And no one

14   was at the back to open the door.  So I walked up on

15   this, what would you call it, sidewalk.

16   Q.    Uh-huh.

17   A.    I started walking up to the front.  And she

18   saw me, and was like "You can't -- this is out of

19   procedure.  You're -- you can't use this -- you can't

20   walk up front."

21          And I was like "Ma'am, my son is freezing and

22   there's no one at the back.  And I was would just like

23   him to go inside."  And so she was like -- so she

24   snatched his hand out of my hand.  And I was just

25   thinking "This school is crazy."  So -- he went inside.

TAYLOR ROSE ROGERS  -  September 24, 2024

1  And I was like -- I just thought she went -- she was
2  not normal.
3      Q.   Okay.  And n that day was she wearing her
4  uniform?
5      A.   I thought like a security uniform.  I
6  thought -- I just thought she was security because
7  there's no way she would have a -- there's no way she
8  would be an officer if she's that nuts.
9      Q.   Okay.  And do you know that the Santa Fe
10  school district has police officers that work there?
11     A.   At the time I'm unsure if I knew.
12     Q.   Okay.  Do you know now?
13     A.   Yes.
14     Q.   Okay.  And so when you -- when you saw the
15  officer, the female officer, the first time, the thing
16  you just told me about, when you had your first
17  encounter with her, and you thought she was a security
18  officer, did you think all of the officers were
19  security guards, that worked at the school at that
20  time, or did you think they had -- that she was somehow
21  different from other officers that worked at the
22  school?
23     A.   I -- I thought that she wasn't a real police
24  officer.  But I knew that -- I recognized Espinoza and
25  he recognized me when we first -- I didn't know where I

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  knew him from, but I recognized him.  And I knew that

2  he was an officer.

3       Q.   Okay.  And do you now know where you

4  recognized him from?

5       A.   I believe it was from the previous

6  altercation with my mother, previous lawsuit.

7       Q.   And -- and what role do you think Officer

8  Espinoza had in that?

9       A.   I can't say.

10      Q.   Okay.  But in any case you think that

11  possibly that's where you knew him from, the prior

12  incident with your mother?

13      A.   Correct, or some issue with custody.

14      Q.   And so I want to make sure I understand

15  what -- understand correctly what you're telling me

16  is -- if I understand what you're saying, is you don't

17  have any specific recollection of Officer Espinoza

18  being involved in your prior arrest; is that correct?

19      A.   Correct.

20      Q.   However, you had the interactions with the

21  police on that day.  So you're thinking possibly he was

22  involved and possibly you knew him from that is that

23  what your testimony is?

24      A.   I believe that my subconscious knew who he

25  was, but my normal memory blocked it out maybe.

TAYLOR ROSE ROGERS  -  September 24, 2024

1        Q.   Okay.

2        A.   I don't know how --

3        Q.   Well, he -- you had basically had

4   interactions with the police regarding custody matters;

5   is that correct?

6        A.   Correct.

7        Q.   And you had interactions with the police

8   regarding the -- the prior arrest with your mother,

9   correct?

10       A.   Correct.

11       Q.   And so -- but on the -- but -- but you don't

12   have a specific recollection of having Officer Espinoza

13   involved in either one of those things; would that be

14   correct?

15       A.   Correct.

16       Q.   Okay.  But in any case, once you encountered

17   Officer Espinoza on this particular day you knew he was

18   a police officer?

19       A.   Correct.

20       Q.   All right.  All right.  So -- so I'm sorry.

21   So back -- we're back at the point where you're --

22   you're driving down Walker and you encounter the female

23   officer.  And tell me what it was, how she got your

24   attention.

25       A.   She started jumping up and down, and

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  screaming.  And so I was like, "Oh, this lady is super

2  mad today."  So I went and parked.  And she chased my

3  car.  So I was like "Oh, this lady is really mad right

4  now."

5       And then she punched -- she started punching

6  the back of my car all the way up to the front.  But

7  also my window doesn't roll down.  So at that point I

8  was thinking "This lady's nuts, so I probably should

9  just go home."

10     Q.    Now --

11     A.    And I was afraid.

12     Q.    Okay.  And so when you first saw the -- the

13  female officer -- do you know her name now?

14     A.    Moore.

15     Q.    Okay.  So when you first saw Officer Moore

16  was it before your -- before your vehicle passed where

17  she was located?

18     A.    I -- I was pretty focused on just getting

19  Leeam inside the school.  So I was like, you know, I'm

20  just going to park and speak with her.  But once she

21  was punching -- and like I -- I was hoping that by the

22  time she got to my door she would be calm, but she

23  wasn't.  So I was like not going to open my door and

24  speak with a lady who's punching my car.

25     Q.    Okay.  But you knew, as you were driving

TAYLOR ROSE ROGERS  -  September 24, 2024

1 through the parking lot, that the officer was trying to

2 get you to stop; would that be correct.

3      A.    Correct.

4      Q.    Okay.  And do I understand your testimony to

5 be that the reason you -- you didn't stop initially

6 was you were trying get your son up to the school?

7      A.    Right.  Oh, I was parking to stop.  But

8 once -- you know, to take my son to school, to talk to

9 her -- but she was going nuts.  So I think that brought

10 back some fear with, you know, the police.

11      Q.    Okay.  So initially when you drove past the

12 -- Officer Moore then you planned to drive into the

13 parking lot, stop, and have an interaction with her,

14 but then as she chased you, then you changed your plan

15 based upon her chasing you; would that be correct?

16      A.    Based upon her punching my vehicle.

17      Q.    Okay.  Where did she punch it?

18      A.    From the back all the way to the front.

19      Q.    Okay.

20      A.    And my son was scared and everything.

21      Q.    Okay.  How did you know that?

22      A.    I believe he was crying.

23      Q.    Okay.  So when -- when Officer Moore punched

24 the -- the side of your vehicle, what -- what did you

25 do?

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1        A.   I got scared and decided to leave her area.
 2        Q.   Okay.
 3        A.   And just was hoping to go home because I
 4   really didn't think she was an officer.  So I'm like
 5   "This crazy security guard is going nuts on me."  I'm
 6   thinking we are going to take the day off.
 7        Q.   Okay.  And -- and what did you do?
 8        A.   I left.  I turned around and I said, "You do
 9   not" -- I stopped in the parking lot and said "You do
10   not touch my vehicle."
11        Q.   Okay.
12        A.   And then I left.
13        Q.   Now, did you say that from inside your
14   vehicle?
15        A.   Yes.
16        Q.   Did you open the door or what?
17        A.   I opened the door.
18        Q.   Okay.  And about how far was Officer Moore
19   from you at that time?
20        A.   Way back here.  Running, I guess.
21        Q.   Did you observe anything that made you
22   understand that she heard what you said?
23        A.   No.
24        Q.   Okay.  Did you think she heard what you said?
25        A.   Probably.
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1    Q.   Do you -- when you -- when you were saying

2    it, did -- was it your impression that you were saying

3    it loud enough that she should have heard what you

4    said?

5    A.   I'm not very loud, so --

6    Q.   Okay.  But in any case she's -- she's

7    basically -- she's got to be -- you've -- you've got to

8    be near her when she's striking your vehicle, correct?

9    A.   She was striking my vehicle while I was

10   parked --

11   Q.   Okay.  Right.

12   A.   -- about to talk to her.

13   Q.   Right.  So -- so you're in that instant,

14   right?  And so what did you do to -- to put distance

15   between you and she when she struck your vehicle?

16   A.   To put distance I drove -- I backed up

17   slowly.

18   Q.   Okay.

19   A.   And as soon as she was out of my way I

20   exited.

21   Q.   Okay.  And which -- what -- you're still in

22   the parking lot at that time, right?

23   A.   Correct.

24   Q.   And so which way did you drive in the parking

25   lot?

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1        A.    Just going back out.  I backed up right here
 2   and went back out.
 3        Q.    To Walker Street?
 4        A.    Correct.
 5        Q.    Okay.  And then which way did you go on
 6   Walker?
 7        A.    I believe I was going this way.  Yeah.
 8              (Witness indicating.)
 9        Q.    To the left?
10        A.    Right.  I was going -- I was just going to go
11   home because I thought she was nuts.  It was either
12   this way or -- I think she had gotten her car.  It
13   might been this way.  She had -- she had gotten in a
14   vehicle.  Someone was right here.  So I just went that
15   way.
16              (Witness indicating.)
17        Q.    Okay.  Again -- and, again -- so you -- from
18   where -- in the -- from the parking lot you were in
19   that would have been the left on Walker, correct?
20        A.    Right.
21        Q.    And --
22        A.    And she was here.  And she -- she thought
23   that -- I -- I guess she thought that I was trying to
24   hit her car, but I was just trying to leave.
25        Q.    Okay.  And the vehicle that you -- that you
```

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1   recognize was the officer's car, was it -- did it have
 2   any markings on it?
 3       A.   No.
 4       Q.   It didn't have -- it didn't have any words
 5   written on it that you recall?
 6       A.   Uh-uh.
 7       Q.   It did not have any lights on it, where
 8   they --
 9       A.   No lights, no sirens.  Nothing.
10       Q.   Okay.  And do I understand you correctly?
11   You don't remember whether Officer Moore was wearing a
12   uniform that day?
13       A.   She wasn't.
14       Q.   Okay.
15       A.   Like a security guard uniform.  It -- no, she
16   wasn't marked as an officer.
17       Q.   Based upon your interaction with her before
18   you thought she was a security person at the school; is
19   that right?
20       A.   Correct.
21       Q.   All right.  What happened next?  You're
22   driving -- you're driving --
23       A.   No, I --
24       Q.   -- along Walker, and then what happened next?
25       A.   So I was driving this way.  And there was
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  cars all in the way.  So I backed -- backed up into the

2  bus round because I saw Espinoza speeding down this

3  street.

4      Q.   On S, going south on S; is that right?

5      A.   I believe so.  And then -- and so I was

6  like -- I didn't want him to hit anyone.  So I backed

7  up and parked because I knew he was an officer.  So I

8  wasn't going to go on a high speed chase with my son.

9      Q.   You backed up into bus ramp -- route --

10 circle?

11     A.   Correct.  And parked.

12     Q.   Okay.

13     A.   Yes.

14     Q.   And then what did -- what did you observe,

15 the direction that Officer Espinoza drove?

16     A.   West on Walker Street towards me.  And then

17 he bashed into my parked car.

18     Q.   Okay.  And then what happened next?

19     A.   Officer Moore walked -- was walking that way.

20 And she had a gun out, or a taser.  And I immediately

21 just got out and --

22     Q.   Did Officer Moore -- was -- was she

23 approaching you from the driver side or the passenger

24 side?

25     A.   Passenger.

TAYLOR ROSE ROGERS  -  September 24, 2024

```
1        Q.   Okay.  And did Officer Espinoza approach you
2   after he stopped his vehicle?
3        A.   Yes, I think he hit me so hard that my tire
4   popped up onto the curb.  Because I know how to back
5   up.
6        Q.   Your -- your testimony is that his vehicle
7   struck your vehicle hard enough that the tire went on
8   the curb; is that correct?
9        A.   Correct.
10       Q.   Okay.  And so after Officer Espinoza's
11  vehicle struck your vehicle did officer Espinoza get
12  out of his vehicle?
13       A.   Yes.
14       Q.   Okay.  And did he approach you?
15       A.   I believe so.
16       Q.   Was it on the driver's side or the passenger
17  side?
18       A.   The driver's side.
19       Q.   Okay.  So you've got Officer Espinoza
20  approaching you on the driver's side.  You have Officer
21  Moore approaching you from the passenger side.  Officer
22  Moore is holding a gun or taser; is that right?
23       A.   Right.  I was freaked out.
24       Q.   Okay.  And what happened next?
25       A.   I was like -- I just got out immediately.
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1      Q.   Okay.  And when you say --

2      A.   First they pulled me out, something like

3  that.

4      Q.   Well --

5      A.   Okay.

6      Q.   So that's what I want to find out.  So you're

7  sitting in the car first.  And you've got officers

8  coming from each side.

9           So did you open the door or did an officer

10  open your door?

11      A.   I opened the door, but he was like right

12  there.  So he like pulled me out.

13      Q.   Okay.  And when you say, "he," you're talking

14  about Officer Espinoza?

15      A.   I believe so.

16      Q.   Okay.  And when you say pulled you out tell

17  me with as much specificity as you can exactly what he

18  did.

19      A.   Just like slammed me on the ground by my arms

20  I believe.

21      Q.   Well, let me ask it this way.  So I'm -- this

22  is important.  So that's why I want to get as much

23  detail as you remember.

24      A.   Right.

25      Q.   Okay.  To the extent you don't remember tell

TAYLOR ROSE ROGERS  -  September 24, 2024

1  me you don't remember.  To the extent you do remember I

2  want you to tell me.

3       A.   Right.

4       Q.   All right.  So did Officer -- do you remember

5  Officer Espinoza using his hands to make contact with

6  you while you're inside the vehicle?

7       A.   I believe so.

8       Q.   Okay.  Do you remember what -- you know, how

9  his hands grabbed you while you were inside the

10 vehicle?

11      A.   No.  I -- I -- it's like blurry, but I know

12 that I was getting out.  And someone slammed me to the

13 ground.  It had to be Espinoza out there.  I think it

14 was Espinoza.

15      Q.   And -- and you think it had to be him because

16 he's the only one there?

17      A.   Yes, at the time.

18      Q.   Okay.

19      A.   And Moore was on the other side, so --

20      Q.   Okay.  So in any case you encountered Officer

21 Espinoza at -- at the -- at the door basically where

22 you're --

23      A.   Right.

24      Q.   -- coming out of; is that right?

25      A.   Right.

TAYLOR ROSE ROGERS  -  September 24, 2024

1      Q.   And then tell me how it was that you went
2  from that position to being on the ground.
3      A.   He slammed me on the ground.
4      Q.   Did you go down on -- on the pavement, in the
5  grass, or what?
6      A.   I'm not sure.  Like grass, pavement.  I'm not
7  sure.
8      Q.   Okay.  And when you went to the ground did
9  you land on your front side your back how?
10     A.   Front.
11     Q.   Okay.  And when you -- when you went to the
12 ground did you land on your front, your side, your
13 back, how?
14     A.   Front.
15     Q.   Okay.  And when you went to the ground, and
16 you landed on your front, where in relationship to your
17 body was Officer Espinoza at that instant?
18     A.   I think he was holding me down.  I mean, he
19 was holding me down at first.
20     Q.   Okay.  And --
21     A.   And he put handcuffs.
22     Q.   Okay.  Do you know when you -- from the time
23 that you left the vehicle until the time you actually
24 struck the ground, do you know if Officer Espinoza
25 was -- still had a grasp of you during that time?

TAYLOR ROSE ROGERS  -  September 24, 2024

```
1        A.   I don't know.

2        Q.   Did Officer Espinoza put the handcuffs -- did

3   he put -- handcuff your hands behind your back?

4        A.   Correct.

5        Q.   Okay.  And so if I understand you correctly

6   you're on the ground.  Officer Espinoza's put handcuffs

7   on your back.

8             And then what happens next?  I'm sorry.  On

9   your hands behind your back.  What happens next?

10       A.   I believe that Carranza showed up.  And he

11  said, "Hey, Rogers, what are you doing again," or

12  "you're getting into trouble again?"

13       Q.   And how did you respond to that?

14       A.   I said, "I'm not doing" -- I said, "I'm not

15  doing anything wrong."  And I was like "I don't know

16  what's going on" and "why am I on the ground."

17       Q.   And what did Officer Carranza say to --

18       A.   Nothing.

19       Q.   Now, where did you know Officer Carranza

20  from?

21       A.   Previous accounts of custody issues.

22       Q.   Had you ever had any kind of conflict with

23  Officer Carranza before?

24       A.   No, not that I can remember.  I mean, he

25  might have been one of the officers who were ganging
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1   up, I would say.

2        Q.   What does -- what does that mean, ganging up?

3        A.   I mean when I would make a report instead of

4   taking a report compassionately they would act like I

5   was crazy.

6        Q.   What were you reporting?

7        A.   Abuse of my child?

8        Q.   By who?  Abuse against your child by who?

9        A.   By -- by his father.

10        Q.   And how many times did you try to make a

11   report of that to the Santa Fe Police?

12        A.   Multiple.

13        Q.   Did you ever learn that any of the times that

14   you wanted to make a report they actually took a

15   report?

16        A.   I know that they took a report a couple of

17   times, but not every time.

18        Q.   Am I correct that the -- the Children's

19   Protective Services did an investigation of your claim

20   of abuse?

21        A.   They claim that they did an investigation,

22   but they're actually just covering it up, so --

23        Q.   What's the nature of the abuse you allege was

24   occurring?

25        A.   Sexual abuse.

TAYLOR ROSE ROGERS  -  September 24, 2024

1  Carranza was conspiring with anyone to not take your

2  abuse reports?

3                    MR. KALLINEN:  Objection, not

4  relevant, more prejudicial than probative.

5       A.   I -- I don't believe that Carranza had any

6  part in that.

7       Q.   (BY MR. GILES:) Okay.  Thank you.  All right.

8       A.   But it's not impossible.

9       Q.   Nothing's impossible.  So in any case Officer

10 Carranza recognized you and called you by name on the

11 date that you were stopped by the --

12      A.   Correct.

13      Q.   -- school police?  Thank you.  And when --

14 when Officer Carranza first approached am I correct

15 that you were still on the ground handcuffed?

16      A.   Correct.

17      Q.   Okay.  And what was the -- the first action

18 that Officer Carranza took?

19      A.   He started putting me in some kind of weird

20 back position.  His arms were -- went -- went through

21 my legs and pulling my legs upwards.  So I was like

22 "This is weird."

23      Q.   All righty.  So I'm going to go through that

24 in -- in some detail.  But I want to -- I'm going to

25 tell you beforehand I'm going to kind of do it step by

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1    step.

2            Because it's my understanding that Officer

3    Carranza originally, when he first approached you,

4    basically, put you in an -- in a hold that basically

5    just dealt with your right arm and shoulder.

6            Do you remember it differently?

7                    MR. KALLINEN:  Objection, vague and

8    confusing.  Assumes facts not in evidence.

9        A.   I really don't remember the order, but I know

10    he was putting me in a whole bunch of wrestling moves.

11    And I was just like "What the heck is this dude doing?"

12    Because I was already on the ground and in handcuffs,

13    so --

14        Q.   (BY MR. GILES:) Uh-huh.  Did you look at --

15    have you seen the video, any of the videos of the

16    arrest?

17        A.   I've seen some of it.

18        Q.   When -- when have you seen -- when's the last

19    time you saw videos?

20        A.   Months ago.

21        Q.   Okay.  Did -- when Officer Carranza first --

22    is it your testimony that when Officer Carranza first

23    approached you -- well, let me ask it this way.

24            The first time the officer physically touched

25    you -- Officer Carranza physically touched you while

TAYLOR ROSE ROGERS  -  September 24, 2024

1      A.   Like there was the arm -- it was just like

2   everything.  I don't know arm holding.  And the legs is

3   what I remember because it hurt really bad.  So

4   basically my legs and back was being pushed.  And then

5   my arms were being held.  Like the handcuffs were

6   really tight.  So it was like a combination of

7   everything.  I don't know.

8                MR. GILES:  Okay.  Objection,

9   nonresponsive.

10     Q.   (BY MR. GILES:) I'm going to do this one

11  little piece at a time, right?

12     A.   Uh-huh.

13     Q.   And so the first question is, am I correct

14  that -- and I'm going to -- I'm going to tell you now,

15  we're going to talk about the details of all those ways

16  that you -- that he used, the different moves.

17     A.   Uh-huh.

18     Q.   But before we get to that what I want

19  answered is just one other question.

20          And the other question is do you claim to be

21  able to tell me of the sequence in which he used any of

22  these wrestling moves?

23     A.   Uh-uh, no.

24                MR. KALLINEN:  Objection, asked and

25  answered.

TAYLOR ROSE ROGERS  -  September 24, 2024

1        Q.   (BY MR. GILES:) I'm sorry, did you say no to

2    that?

3        A.   Correct.

4              MR. KALLINEN:  Objection, asked and

5    answered.

6        Q.   (BY MR. GILES:) Okay.  Thank you.  Now,

7    the -- the next question -- the next part of the -- of

8    your answer, I think you -- what you want to talk

9    about, is what the wrestling moves were; is that right?

10       A.   Right.

11       Q.   Okay.  So tell me what wrestling moves that

12   you remember Officer Carranza using.

13       A.   The main one was pushing my back, using my

14   legs.  So like basically kind of crushing my spine,

15   holding up my leg, like one of my legs.  And --

16       Q.   Now, while Officer Carranza's using that

17   particular tactic, what had you done immediately before

18   that?  What physical action had you -- you done

19   immediately before that?

20       A.   Nothing.

21       Q.   Before the time that you recognized that

22   there were ants on the ground where you were, had you

23   made any effort to get up off the ground?

24       A.   I wanted to get up because I was being put in

25   the wrestling moves, and I was being hurt.  I don't

TAYLOR ROSE ROGERS  -  September 24, 2024

1  know exactly when the ants came into the picture.  But

2  for sure when the ants were there that -- you know, it

3  was combination of the crazy moves, the ants, and why I

4  was even on the ground in the first place.

5      Q.   Okay.  And so what I'm trying find out now is

6  -- you're -- Officer Espinoza puts you on the -- on the

7  ground, handcuffed your hands behind your back.  Then

8  Officer Carranza comes, and he's basically there using

9  wrestling-type holds you're saying?

10     A.   Right.  They never spoke with me, sorry.

11     Q.   Okay.  That's okay.  And so at that -- from

12  that point in time up until the point you realized

13  there were ants there, did you make any effort to get

14  up off the ground?

15               MR. KALLINEN:  Objection, asked and

16  answered.

17     A.   Until there were wrestling moves that were

18  putting me in physical pain, no.  I was completely

19  ready to be treated like a human and --

20     Q.   (BY MR. GILES:) Okay.  And so --

21     A.   -- and speak.

22     Q.   I'm sorry, go ahead.

23     A.   And speak, you know, to the officers.  But

24  that -- that was never their -- that opportunity was

25  not given.

TAYLOR ROSE ROGERS  -  September 24, 2024

1              MR. GILES:  Okay.  Objection,

2    nonresponsive.

3         Q.   (BY MR. GILES:) So once you -- once you

4    decided to respond to the wrestling moves by trying to

5    get up off the ground what did you to?

6         A.   I was waiting for them to -- I didn't do

7    anything.  I was waiting for them to pick me up.

8         Q.   Okay.

9         A.   I was pleading with them to let me up and

10   just talk to me.

11        Q.   Did you ever -- from -- from being face down,

12   handcuffed with your hands behind your back, did you

13   ever take any motion to move on to your side?

14        A.   Possibly.  I believe so.

15        Q.   Okay.  And so why was it that you took the

16   motion to -- to get on to your side?

17        A.   I believe there was ants all over me.

18        Q.   Before the time that -- that you recognized

19   there was ants on you, did you take any motion to get

20   on your side?

21        A.   It's possible because whatever pressure was

22   being put on my back -- kind of like unnecessary

23   torture.

24              MR. GILES:  Objection, nonresponsive

25   after "it's possible."

TAYLOR ROSE ROGERS  -  September 24, 2024

1      Q.   (BY MR. GILES:) Before the time that you

2  realized there were ants on you did you -- do you --

3  did you pick your legs up towards your chest?

4      A.   Towards my chest?

5      Q.   Yeah.  You -- you have knees, right?

6  Because -- you didn't do that?

7      A.   (Witness nods.)

8           MR. KALLINEN:  You have to verbalize

9  your answer.

10     A.   No.

11     Q.   (BY MR. GILES:) How -- approximately how long

12  were you on the ground before you recognized that there

13  were ants?

14     A.   I have no idea.

15     Q.   About how long -- after the time that you

16  realized there were ants, about how long was it before

17  you were raised off the ground?

18     A.   I -- I think that I was on the ground for

19  like five minutes in the ants, at least.

20     Q.   So do you recall Officer Carranza ever

21  holding your right shoulder?

22     A.   I don't believe.  I -- I can't remember.

23     Q.   Do you recall Officer Carranza saying to you

24  "I'll stop when you stop"?

25     A.   Yes.

TAYLOR ROSE ROGERS  -  September 24, 2024

1       Q.   And what were you doing at that moment?

2       A.   Being eaten by ants.

3       Q.   When I look at the recording, and listen to

4  the recording, the first time I hear you mention ants

5  is -- you had already been on the ground for about two

6  and a half minutes.

7            Do you remember it differently?

8                 MR. KALLINEN:  Objection.  The video

9  speaks for itself.

10       A.   I'm not sure.  I don't know the timeframe.

11       Q.   (BY MR. GILES:) Okay.  Do you deny that from

12  the time that you first mentioned the word ant until

13  the time that you were up off the ground was no more

14  than 30 seconds?

15                 MR. KALLINEN:  Objection, assumes

16  facts not in evidence.  And the video speaks for

17  itself, and is the best evidence.

18       A.   Do I deny that the -- that it was -- that it

19  was more than 30 seconds?

20       Q.   (BY MR. GILES:) I'm asking -- I'm asking you

21  do you --

22       A.   Or do I agree --

23       Q.   Is it your testimony that it was long -- it

24  took longer than 30 seconds for you to get up from the

25  time that you first said the word "ant"?

TAYLOR ROSE ROGERS  -  September 24, 2024

1        A.   100 percent.

2        Q.   Okay.  Now, how long after the -- the time

3   that you first said "ant" was it that -- that you

4   perceived an officer start taking action in -- in

5   trying to get you up?

6        A.   At least five minutes.

7        Q.   So what was it that -- did you realize that

8   you were in ants before you told somebody you were in

9   ants?

10       A.   I immediately -- when I realize that I was

11  being bitten by ants immediately verbalized that I was

12  being bitten.

13       Q.   And when you -- and do you remember how you

14  verbalized that?

15       A.   I said, "I'm in ants, can you please let me

16  up?"

17       Q.   Okay.

18       A.   Something along those lines.

19       Q.   And then when you said that what's the next

20  thing that happened or you heard?

21                 MR. KALLINEN:  Objection, calls for a

22  narrative, vague.

23       A.   They just kept on saying for me to be still

24  and comply, but I was not --

25       Q.   (BY MR. GILES:) After you said, "there's

TAYLOR ROSE ROGERS  -  September 24, 2024

1  ~~ants" --~~

2  ~~MR. KALLINEN:  Objection.  Taylor was~~

3  ~~just about to finish her sentence.~~

4  ~~A.   I -- I was not doing anything to not comply~~

5  ~~because I was in a pile of ants.~~

6  ~~MR. KALLINEN:  Objection,~~

7  ~~nonresponsive.~~

8  ~~A.   So I just wanted up.~~

9  ~~Q.   (BY MR. GILES:) I'm sorry.  Go ahead.~~

10  ~~A.   That was it.~~

11  ~~Q.   Okay.~~

12  ~~MR. GILES:  Objection, nonresponsive.~~

13      Q.   (BY MR. GILES:) The -- after you said,

14  "there's ants," did you hear any officer say "I'm

15  trying to re-position you"?

16      A.   I can't recall.

17              MR. KALLINEN:  Objection.  The video

18  speaks for itself.

19      Q.   (BY MR. GILES:) How did you ultimately -- so

20  from the point to where you said, "I'm in ants," how --

21  how were you -- how did you get up from there?  How

22  were you raised from that position?

23      A.   I think someone finally picked me up.

24      Q.   Do you know who it was that picked you up?

25      A.   No.

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1                    MR. KALLINEN:  Objection.  The video
 2    speaks for itself.
 3         Q.   (BY MR. GILES:) And do you know whether it
 4    was one -- one person or more than one person that
 5    picked you up?
 6         A.   I believe it was one person.
 7         Q.   Do you know if it was Officers Carranza that
 8    picked you up?
 9         A.   That's what I assume.
10         Q.   Okay.  And then once you were -- you're
11    picked up to your feet what's the next thing that
12    happened?
13         A.   I -- I believe I started saying -- asking why
14    no one helped me with the ants and why I was being
15    arrested or put in handcuffs.
16         Q.   Were you asking that to any particular
17    person?
18         A.   Everyone there.
19         Q.   Did anyone respond to you?
20         A.   No.
21         Q.   Okay.  And where were you located when
22    that -- in the relative position of where you
23    originally were, where were you located when that
24    conversation happened, when that statement was made?
25         A.   By my vehicle.  All around, and just walking
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  around.

2      Q.   Okay.  What happened or you heard next?

3      A.   I was like -- I believe I said something like

4  "We're all going somewhere after we die, and" --

5      Q.   And?

6      A.   "Where are you going to be, where are you

7  going to go when we die?"

8      Q.   And who did you say that to?

9      A.   All -- everyone.  I was speaking to Moore,

10  but I was directing it to everyone.

11      Q.   Okay.  Anyone say anything in response to

12  that?

13      A.   I believe Moore said something.  I don't

14  really know.  I don't know.

15      Q.   All right.  What happened or you heard next?

16                  MR. KALLINEN:  Objection, vague, calls

17  for narrative.

18      A.   I was just trying to be able to get the ants

19  off because the ants were still biting me.  But I knew

20  that they would not, so I just tried to deal with it.

21      Q.   (BY MR. GILES:) Okay.  So what happened next?

22                  MR. KALLINEN:  Objection, calls for

23  narrative, vague.

24      A.   And they put me in the car, and never told me

25  why I was being arrested.

**SUMMIT COURT REPORTING**
**713-581-7785**

TAYLOR ROSE ROGERS  -  September 24, 2024

1        Q.    (BY MR. GILES:) Okay.  Do you know which

2   officer put in the car?

3        A.    Uh-uh.  No.

4        Q.   Okay.

5                    MR. GILES:  You want to take a short

6   break?

7                    THE WITNESS:  Sure.

8                    MR. GILES:  Okay.

9                    THE VIDEOGRAPHER:  It is 11:21 a.m.

10   And we are off record.

11                    (Off the record.)

12                    THE VIDEOGRAPHER:  Time is 11:39 a.m.

13   And we are back on the record.

14        Q.   (BY MR. GILES:) All right.  We're going to

15   catch up where we left off then.

16            So you're -- you're in a police car at the

17   school, right?

18        A.   Correct.

19        Q.   And so -- thank you.  And is there anything

20   else up to this point in time that you recall any

21   officers that have said to you?

22                    MR. KALLINEN:  Objection.

23        Q.   (BY MR. GILES:) That we haven't already

24   talked about.

25            Anything else that an officer said to you?

TAYLOR ROSE ROGERS  -  September 24, 2024

1                    MR. KALLINEN:  Objection, vague,

2    overbroad.

3         A.   I can't think of anything.

4         Q.   (BY MR. GILES:) Okay.  Now, same period of

5    time.  From the time -- up until this time that you're

6    put in the police car anything else that you recall

7    saying that we haven't talk about?

8                    MR. KALLINEN:  Objection, overly broad

9    and vague, calls for narrative.

10        A.   Everyone was pretty much silent for the most

11   part from what I remember.

12        Q.   (BY MR. GILES:) Okay.  All right.  So do you

13   know which officer drove you to -- well, am I correct

14   that you went from there to the Santa Fe Police

15   Department?

16        A.   Correct.

17        Q.   Do you know who the officer was that drove

18   you there?

19        A.   I don't know.

20        Q.   Do you recall any conversation you had with

21   the person who drove you to the police station while

22   you were in the police car?

23        A.   I believe I spoke about how there were still

24   ants on me.  And I was asking if I could take them off.

25        Q.   And what was response to that?

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1      A.   "We will -- you can take them off when you
 2 get to Santa Fe."
 3      Q.   And about how long does it take to get from
 4 the school to the Santa Fe Police Department?
 5      A.   Two or three minutes.  I don't know.
 6      Q.   So when you got to the -- did -- did the
 7 officer that transported you from the -- from the
 8 school to the Santa Fe Police Department -- did he stop
 9 anywhere between the time that he left the school and
10 the time he got to the police department?
11      A.   No.
12      Q.   When -- when you arrived at the Police
13 Department what happened there?  What's the first thing
14 that happened there?
15      A.   They allowed me to go -- or they took -- I
16 believe they took the handcuffs off and allowed me to
17 take the ants off.
18      Q.   Okay.  And so as soon as the police car got
19 to the -- well, how long after the time the police car
20 got to the -- to the police station was it that you got
21 out of the -- of the police car and went into the
22 police department?
23      A.   You mean like how long did I stay in the car
24 or --
25      Q.   Yes.  Let me ask a better question.  What I'm
```

SUMMIT COURT REPORTING
713-581-7785

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  trying to do is figure out basically how long it was

2  that you -- from the time you got there in the car

3  until you got into the building.

4        So was there any delay from -- while you

5  were -- before you exited the police car at the station

6  and the time you went into the building?

7              MR. KALLINEN:  Objection.  The video

8  speaks for itself.  And it's the best evidence.

9     A.   There might have been some delay, but I

10 really don't know the -- the exact time.

11    Q.   (BY MR. GILES:) Okay.  Do you -- do you

12 recall -- well, was it like this?  Did you -- did you

13 arrive at the police station and then something else

14 happened before you went in the police station, or did

15 you arrive at the police station, and you directly went

16 into the police station?

17              MR. KALLINEN:  Objection, vague.  And

18 the video speaks for itself, is the best evidence.

19    A.   I'm really not sure.

20    ~~Q.   (BY MR. GILES:) Okay.  All right.  So when~~

21 ~~you went into the police station what's the first thing~~

22 ~~that you remember happening when you got inside the~~

23 ~~police station?~~

24              ~~MR. KALLINEN:  Objection, vague and~~

25 ~~calls for narrative.~~

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1    ~~A.    I believe I just was trying to ask if I could~~

2    ~~get the ants off.~~

3    ~~Q.    (BY MR. GILES:) And were you asking the~~

4    ~~officer that transported you or were you asking~~

5    ~~somebody else?~~

6    ~~A.    Carranza was there.  And I don't know who~~

7    ~~else.~~

8    Q.    Okay.  And so once you got to the police

9    station, and you made that request, then what was the

10    response to that?

11    A.    I'm unsure.

12    Q.    Okay.  Well, you said earlier you had a

13    chance to get the ants off of you; is that right, at

14    some point at the police station?

15    A.    So we're at the police station.  And, I mean,

16    I would be assuming if I say what he said.  Like I

17    don't remember definitively, but he might have said

18    something like "We're trying to go as fast as we can,"

19    or something like that.

20    Q.    Okay.  Was there a time, though, after you

21    got the police station, where you had a chance to get

22    the ants off of you?

23    A.    There was a time, correct.

24    Q.    Okay.  And what -- what did you do to get the

25    ants off of you?

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1      A.   I put my face in the sink, and just started
 2 getting them all off.
 3      Q.   Okay.  And you basically moved all down your
 4 body.
 5           So where were the --
 6      A.   And shaking my hair because they were in my
 7 scalp.
 8      Q.   Okay.  So that's my next question.  Where was
 9 it -- where did you find ants -- once you got to the
10 police station where were -- where did you locate ants
11 on your body?
12      A.   Everywhere.  Ears and nose.  And they were in
13 the my hair.  Like obviously, they were in my pants,
14 legs, bra and -- pretty much everywhere.
15      Q.   Okay.  So did you -- basically the place
16 where you were rinsing off, was that in a detention
17 cell or where was that in the police station that you
18 remember?
19      A.   Right out in the open.  Like next to the
20 microwave and in front of all the cells.
21      Q.   In front of the cells?
22      A.   Correct.
23      Q.   Okay.  And did you know -- was an officer
24 with you at that time?
25      A.   Yes.
```

TAYLOR ROSE ROGERS  -  September 24, 2024

1  said that?

2       A.   I believe he said that, but I don't -- the

3  problem is I don't know like when he said it or -- you

4  know.  He said it.  I don't know when -- when he said

5  it.

6       Q.   Okay.

7       A.   Because it might have been a couple hours

8  after or something.

9       Q.   Okay.  So how long were you -- approximately

10 how long were you at the police station?

11      A.   I believe I went in the morning.  And I think

12 I was starting to be transferred in the middle of the

13 day.

14      Q.   Okay.  An when you were transferred to the

15 county jail were you transferred by a Santa Fe officer

16 or the county officer?

17      A.   Carranza.

18      Q.   Did you take a shower at the Santa Fe police

19 station?

20      A.   No.

21      Q.   Could -- did you have a chance to look in a

22 mirror while you were at the Santa Fe police station?

23      A.   Huh?  No.

24      Q.   While you were at the Santa Fe police

25 station, did you have any -- other than the -- the

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  ants, was there any other injury you thought you had

2  sustained during your arrest -- or during your arrest?

3      A.   Like back injury from the impact and from the

4  move, the wrestling move, whatever wrestling move he

5  was doing.  But I was -- I was mainly just afraid that

6  like maybe I would be going into shock from the ant

7  bites.

8      Q.   And when you said from the impact you're

9  talking about the impact of the collision of the

10  vehicles?

11      A.   From -- yeah, from the collision that -- of

12  him impacting my car.  Espinoza.

13      Q.   All right.  Anything else you recall

14  occurring at the Santa Fe police station before you got

15  transferred to county?

16                  MR. KALLINEN:  Objection, vague,

17  overbroad, and calls for a narrative.

18      A.   I believe Carranza invited me to his

19  wrestling or boxing match that he was having.

20      Q.   (BY MR. GILES:) Where was it going to be?

21      A.   In Galveston.

22      Q.   Was that that fundraiser that police and

23  firemen have?

24      A.   I believe so.

25      Q.   Have you ever been to that boxing match?

TAYLOR ROSE ROGERS  -  September 24, 2024

1      A.   Not much other than what I stated.  I think I
2  said I -- yeah, that's it.  I don't know.
3      Q.   Okay.  Now, did you -- did the -- the medical
4  person at the county jail offer you any kind of medical
5  care or further evaluation?
6      A.   I believe once I started swelling up in the
7  jail people were like getting concerned.  So they were
8  like "She needs go see the doctor."  Up in there.
9      Q.   And are you -- is it your testimony that
10  somebody told you that or you heard somebody say that?
11      A.   I think people were pretty aware that it was
12  a strange occurrence for someone to be covered in ant
13  bites and look like a care bear.  So they took notice
14  of that and -- and brought me in.
15      Q.   Okay.  And I don't doubt that, buy I'm trying
16  to make sure I understand how you know they took
17  notice.
18           So did -- did somebody say something
19  specifically, that you heard about that or what?
20      A.   There were -- there were officers like
21  looking in the window of the jail cell.  Kind of like
22  taunting.
23      Q.   And that -- and -- and those would be
24  sheriff's deputies at the county jail, right?
25      A.   Correct.

TAYLOR ROSE ROGERS  -  September 24, 2024

1       Q.   Okay.  Now, about how long were you at the
2    county jail before the swelling started?
3                   MR. KALLINEN:  Objection, assumes
4    facts not in evidence.
5       A.   A couple of hours.
6       Q.   (BY MR. GILES:) All right.  And then when you
7    got to that point, when the -- the swelling was
8    apparent, what, if anything, did the county do -- how
9    did the county respond?
10      A.   They gave me some Benadryl.
11      Q.   Okay.  And then did you get any other medical
12   care evaluation at the county jail?
13      A.   Not -- just the Benadryl.  I -- I saw a
14   doctor of some sort.  It was a doctor.
15      Q.   At the county jail?
16      A.   Right.
17      Q.   And when -- when you saw that doctor did he
18   prescribe any other medical care for you?
19      A.   No, him and the nurses were laughing about
20   it, so --
21      Q.   Other than giving you Benadryl, did the
22   personnel at the county give you any other medical
23   care?
24      A.   No.
25      Q.   How long were you at the county jail before

TAYLOR ROSE ROGERS  -  September 24, 2024

```
1   you were released?

2         A.   I believe two days.

3         Q.   Do you recall what your bond was set at?

4         A.   No.

5         Q.   Do you recall what you were charged with?

6         A.   Evading arrest.

7         Q.   After the time that Officer Carranza brought

8    you to the county jail, did you have any more

9    interactions with him after that?

10        A.   After the county, no.

11        Q.   Did you have any interactions with Officer

12   Carranza after you got into the county jail?

13        A.   No.

14        Q.   All right.  So when you were released from

15   the county jail, did you seek any further medical

16   evaluation or treatment?

17        A.   Yes.

18        Q.   Where?

19        A.   At Mainland in Texas City.

20        Q.   That's a hospital?

21        A.   Yes.

22        Q.   And what kind of -- when you went to Mainland

23   Hospital what did you tell the persons when you first

24   got there, that you -- why you were there?

25        A.   I wanted to make sure that I would be all
```

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  ~~right with the ants situation and --~~

2       ~~Q.   Okay.  And then what kind of an evaluation~~

3  ~~-- what -- and I'm not a -- I know you're not a doctor.~~

4            ~~You're not a doctor, right?  No?~~

5       ~~A.   No.~~

6       Q.   Okay.  Great.  So I know you're not a doctor.

7  I'm just going to ask you practically because you're

8  the person they're actually talking to and working

9  with.

10            So what is it that you observed that they did

11  to respond to your -- your question about your ant --

12  your aunt situation?

13       A.   What did they do?  They prescribed me some

14  antibiotics, some strong antibiotics.  Because they

15  said that I had a chance to get staph.

16       Q.   Do you have any reason to believe that you

17  ever did get staph?

18       A.   No.  I don't know.  I don't think so.

19       Q.   How long -- did they admit -- did they admit

20  you into Mainland Hospital?

21       A.   No, they didn't.  I didn't want to be

22  admitted.

23       Q.   Did anybody at Mainland tell you you should

24  be admitted?

25       A.   No, not that I remember.

TAYLOR ROSE ROGERS  -  September 24, 2024

1        Q.    Okay.  And other than giving you medication,

2    antibiotics -- and I'm sorry -- did you get other

3    medication, too?

4        A.    No.

5        Q.    Other than giving you the antibiotics did

6    they give you any other care there?

7        A.    No.

8        Q.    All right.  And then I'll look through those

9    in a second.  We'll just talk through them first.

10            And then did you take the antibiotics

11   after -- that they prescribed?

12       A.    Yes.

13       Q.    Okay.  Did you seek any other medical care

14   that you associate with your arrest after that?

15       A.    Yes.

16       Q.    Where?

17       A.    My back injury.  I don't know exactly where.

18   Minivasive, something like that, for like shock

19   treatments for my back.  And I had an MRI or some kind

20   of scan.

21       Q.    Okay.  And when -- when you say shock

22   treatments for your back, what do you mean by that?

23       A.    Where they put electrodes like on your back.

24   Hot and cold therapy.

25       Q.    Have you ever been to a chiropractor?

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1      A.    No.

2      Q.    Okay.  So are you familiar with the word TENS

3  Unit?

4      A.    No.

5      Q.    Okay.  So the -- the items that you're

6  talking about, though, with the shock treatment, were

7  they the -- did they have little patches --

8      A.    Yes.

9      Q.    -- that are attached to wires?  And then they

10  put on your back, and then they put electrical current

11  to stimulate you; is that right?

12      A.    Correct.

13      Q.    Okay.  And then you had an MRI.  But other

14  than the -- the shock treatment that you described, and

15  the MRI, was there any other care that you got at that

16  particular health care provider?

17      A.    No.  There's another health care provider

18  with -- who was an -- I don't know.  A back specialist,

19  something like that.  And he suggested the injections

20  that help your herniated discs.

21           And I didn't want to do that because I know

22  people who have had back injuries.  And it makes -- it

23  tends to make the problem worse over time.

24      Q.    Okay.  And do you -- do you remember who that

25  doctor was or what facility that doctor was at?

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1    A.    I don't know.  It was far.  I don't remember

2  the doctor's name or where exactly it was.

3                    MR. GILES:  We'll look at some of his

4  records in a second, see if we can figure out in more

5  detail in relation to those.

6      Q.    (BY MR. GILES:) Any other -- but -- but just

7  an overview, though, are -- any other health care

8  professionals that you've got evaluation or treatment

9  that you associate with your arrest?

10     A.    That I spoke with a therapist for like the

11  PTSD.

12     Q.    Okay.  Let me do this before we're going to

13  go back -- finish this so I don't forget.

14            Were you convicted of evading arrest based on

15  the incidents that occurred at the school that day?

16     A.    When you say convicted, does that mean found

17  guilty, right, or --

18     Q.    Well, did you plead guilty to that charge?

19     A.    Yes, under duress.

20     Q.    And what was the duress?

21     A.    I believe that there was a chance that I

22  could have gotten a bad jury because I was advised by

23  my lawyer that I could have, and that I wouldn't be

24  able to see my son.

25                    Also, they handed me a piece of paper

TAYLOR ROSE ROGERS  -  September 24, 2024

1  unless if you have back surgery and it's successful, so

2  it's kind of risky, it either works or you're screwed

3  even worse.  So --

4                    MR. GILES:  Objection, nonresponsive.

5       Q.   (BY MR. GILES:) I'm asking a little bit

6  different question.  I'm asking you if the doctor gave

7  you any estimated time of how long it might be before

8  the symptoms subside.

9       A.   For the rest of your life.

10      Q.   And who told you that?

11      A.   The doctor.

12      Q.   Which doctor?

13      A.   Multiple sources.

14      Q.   I'm sorry.  Which doctor?

15      A.   I don't know his name.

16      Q.   Was it -- the doctor from which location?

17      A.   I believe there was only that one doctor.

18  The other people I don't believe were doctors.

19      Q.   And did your -- did the doctor -- I noticed

20  that when you -- well did you tell the doctor that

21  after -- the doctors, where they recommended the MRI,

22  that you even had an interaction with the police?

23      A.   Yes.

24      Q.   The records that I've seen basically show

25  that you reported that you had a traffic accident, a

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1  motor vehicle accident.

2      A.    Well, I'm very open.  So I probably told them

3  all about it.

4      Q.    And you think that they just didn't put that

5  in your medical record?

6      A.    It's very possible.

7      Q.    Okay.  Did any doctor tell you that if you

8  did have a -- sustain an injury to your back that that

9  doctor thought he could tell the -- the difference in

10  the causation between the car accident and the arrest?

11      A.    Can you repeat that?

12      Q.    Sure.  Sure.  Did any doctor tell you that he

13  had any -- any way to be able to make a distinction

14  between whether you got this herniated disc from --

15      A.    No.

16      Q.    -- the car wreck or the police officers?

17      A.    No.

18                    MR. KALLINEN:  Objection, assumes

19  facts not in evidence and misstates prior testimony.

20      Q.    (BY MR. GILES:) And I apologize I'm going to

21  have to ask these questions.  But it's -- I'm sorry.  I

22  guess it's part of my job.  So one of the things that

23  you filled out whenever you went to Minivasive was a

24  drug screen test where basically you get a yes or no

25  block.

TAYLOR ROSE ROGERS  -  September 24, 2024

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      GALVESTON DIVISION

 3
   TAYLOR ROSE ROGERS,            )
 4                                )
          Plaintiff,              )
 5                                )    Civil Action No.
                                  )    3:24-CV-00038
 6   vs.                          )
                                  )
 7   CITY OF SANTA FE, TEXAS,     )
   et al,                         )
 8                                )
          Defendants.             )
 9                                )

10                     REPORTER'S CERTIFICATE

11                      SEPTEMBER 24, 2024

12           I, Nilda Codina, Notary in and for the State

13   of Texas, hereby certify to the following:

14           That the witness, TAYLOR ROSE ROGERS, was

15   duly sworn by the officer and that the transcript of

16   the oral deposition is a true record of the testimony

17   given by the witness;

18           I further certify that pursuant to FRCP Rule

19   30(f)(1) that the signature of the deponent:

20           _____ was requested by the deponent or a

21   party before the completion of the deposition returned

22   within 30 days from date of receipt of the transcript.

23   If returned, the attached Changes and Signature Page

24   contains any changes and the reasons therefor;

25           __X___ was not requested by the deponent or a
```

SUMMIT COURT REPORTING
713-581-7785

**TAYLOR ROSE ROGERS  -  September 24, 2024**

1   party before the completion of the deposition.

2           I further certify that I am neither attorney

3   nor counsel for, related to, nor employed by any of the

4   parties to the action in which this testimony was

5   taken.

6           Further, I am not a relative or employee of

7   any attorney of record in this case, nor do I have a

8   financial interest in the action.

9           Subscribed and sworn to on this the 7th day

10  of October, 2024.

11                          /s/ Nilda Codina

12                          _____
                            NILDA CODINA
                            Notary in and
13                          For the State of Texas
                            My Commission No. 12878135-3
14                          Expires:  10/24/2027
                            CRC for Summit Court Reporting
15                          Firm Registration No. 62
                            1225 North Loop West, Suite 327
16                          Houston, Texas 77008
                            Phone: (713) 581-7785

17

18

19

20

21

22

23

24

25







CASE NO. 21CR2713 COUNT NO.
INCIDENT NO./TRN: 9217525952 A001

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 212TH DISTRICT ~~FILED~~ |
| | § | |
| v. | § | COURT    2022 SEP -1 PM 12: 01 |
| | § | |
| TAYLOR ROSE ROGERS | § | GALVESTON COUNTY, TEXAS |
| | § | DIST CLERK |
| STATE ID NO.: TX16267703 | § | GALVESTON COUNTY TEXAS |

## ORDER OF DEFERRED ADJUDICATION

| | | |
|---|---|---|
| Judge Presiding: Hon.  Patricia Grady | Date Proceedings Deferred: | September 1, 2022 |
| Attorney for State:    Angela Kao - 24105652 | Attorney for Defendant: | Alexander Houthuijzen - 24101224 |

Offense:
**EVADING ARREST DET W/VEH**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **38.04(b)(2)(A) Penal Code** |

| Date of Offense: | Defendant waived the right to trial by jury and entered the plea below: |
|---|---|
| **August 19, 2021** | **GUILTY** |

| Degree of Offense: | | Findings on Deadly Weapon: |
|---|---|---|
| **3RD DEGREE FELONY** | 21 - CR - 2713 DCJUDG Judgment 2436201 | **N/A** |
| 1st Enhancement Paragraph: | | Finding on 1st Enhancement Paragraph: |
| **N/A** | | **N/A** |
| 2nd Enhancement Paragraph: | | Findings on 2nd Enhancement Paragraph: |
| **N/A** | | **N/A** |

Terms of Plea Bargain   (if any): or ☒ Terms of Plea Bargain are attached and incorporated herein by this reference.
**TWO (2) YEARS DEFERRED COMMUNITY SUPERVISION**

## ADJUDICATION OF GUILT DEFERRED;

### DEFENDANT PLACED ON DEFERRED ADJUDICATION COMMUNITY SUPERVISION.

### PERIOD OF DEFERRED ADJUDICATION COMMUNITY SUPERVISION: TWO (2) YEARS.

### CONFINEMENT AS A CONDITION OF DEFERRED ADJUDICATION COMMUNITY SUPERVISION:

☐ The Court ORDERS Defendant confined _____ DAYS in ☐ THE COUNTY JAIL ☐ A STATE JAIL FACILITY as a condition of deferred adjudication community supervision. The period of confinement as a condition of community supervision starts when Defendant arrives at the designated facility, absent a special order to the contrary.

| Fines: | Court Costs: | Reimbursement Fees: | Restitution: | Restitution Payable to: AGENCY/AGENT |
|---|---|---|---|---|
| $ | $290.00 | $ 22.00 | $ | (See special finding or order of restitution which is incorporated herein by this reference.) |

☐ Defendant is required to register as sex offender in accordance with Chapter 62, Tex. Code Crim. Proc.
**(For sex offender registration purposes only)** The age of the victim at the time of the offense was _____.

Was the victim impact statement returned to the attorney representing the State?  N/A

This cause was called and the parties appeared. The State appeared by her District Attorney as named above.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared with Counsel.
☐ Defendant appeared without counsel and knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

**CITY 000075**

DEFENDANT'S EXHIBIT
2
T. Rogers  9/29/24

Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court admonished Defendant. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of the plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court FINDS that such evidence substantiates Defendant's guilt. However, the Court FINDS that it is in the best interest of society and Defendant to defer proceedings without entering an adjudication of guilt and to place Defendant on deferred adjudication community supervision.

Therefore, the Court ORDERS no judgment entered at this time. The Court further ORDERS Defendant placed on deferred adjudication community supervision for the period of time indicated above as long as Defendant abides by the conditions of the deferred adjudication community supervision.

The Court FINDS that the Presentence Investigation, if so ordered, was done according to the applicable provisions of Subchapter F, Chapter 42A, Tex. Code Crim. Proc.

After having conducted an inquiry into Defendant's ability to pay, the Court Orders Defendant to pay the fine, court costs, and restitution, if any, as indicated above.

The document setting forth the conditions of deferred adjudication community supervision is attached and incorporated herein by this reference.

____ *(Defendant to initial)*    The Court FINDS that Defendant was admonished and acknowledged that, pursuant to Article 42A.301 of the Texas Code of Criminal Procedure, a risk and needs assessment will be conducted with respect to Defendant for purposes of determining the conditions of community supervision. The Court FINDS that Defendant agrees to the following standard conditions of community supervision which are hereby imposed prior to the risk and needs assessment being conducted. Additionally, The Court FINDS that Defendant agrees that based upon the results of the risk and needs assessment, the Court may order additional conditions of community supervision.

**Fines Imposed Include (check each fine and enter each amount as pronounced by the court):**
- ☐ General Fine (§12.32, 12.33, 12.34, or 12.35, Penal Code, Transp. Code, or other Code) $ _____ (not to exceed $10,000)
- ☐ Child Abuse Prevention Fine (Art. 102.0186, Code Crim. Proc.) $ _____ ($100)
- ☐ EMS, Trauma Fine (Art. 102.0185, Code Crim. Proc.) $ _____ ($100)
- ☐ Family Violence Fine (Art. 42A.504 (b), Code Crim. Proc.) $ _____ ($100)
- ☐ Juvenile Delinquency Prevention Fine (Art. 102.0171(a), Code Crim. Proc.) $ _____ ($50)
- ☐ State Traffic Fine (§ 542.4031, Transp. Code) $ _____ ($50)
- ☐ Children's Advocacy Center Fine - as Cond of CS (Art. 42A.455, Code Crim. Proc.) $ _____ (not to exceed $50)
- ☐ Repayment of Reward Fine (Art. 37.073/42.152, Code Crim. Proc.) $ _____ (To Be Determined by the Court)
- ☐ Repayment of Reward Fine - as Cond of CS (Art. 42A.301 (b) (20), Code Crim. Proc.) $ _____ (not to exceed $50)

### Furthermore, the following special findings or orders apply:

☒    APPEAL WAIVED. NO PERMISSION TO APPEAL GRANTED.

☐    The Court FINDS that Defendant was prosecuted for an offense under Title 5 of the Penal Code that involved family violence. *TEX. CODE CRIM. PROC. art. 42.013.*

Signed and Entered on this the 1ST day of September, A.D., 2022.

JUDGE PRESIDING
212TH JUDICIAL DISTRICT COURT
GALVESTON COUNTY, TEXAS

**CITY 000076**

A copy furnished to the above named Defendant and noted in the Docket on this the <u>1ST</u> day of <u>September</u>, A.D., <u>2022</u>.

**JOHN D. KINARD, DISTRICT CLERK,**
**GALVESTON COUNTY, TEXAS**

BY: *Alexandria Crockett*, DEPUTY
CLERK 212TH JUDICIAL DISTRICT COURT
GALVESTON COUNTY, TEXAS

```
******************************
*                            *
*                            *
*                            *
*                            *
*                            *
*                            *
******************************
```
**DEFENDANT'S RIGHT THUMBPRINT**

**CITY 000077**